Michael T. Stoller, Esq., (Bar No. 120241)
LIBERTY LAW GROUP
7215 Canby Avenue
Reseda, California 91335
Telephone: 310-245-4028
Email: michael.stoller@stollerlawgroup.com
Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMILA MROUEH, mother of her minor children A M. and N.M.<br><br>    Plaintiff,<br><br>v.<br><br>LOS ANGELES COUNTY DEPT OF CHILD AND FAMILY SERVICES (DCFS);<br>MICHELLE PRAH;<br>GUADALUPE EAKMAN;<br>JESSE JUAREZ;<br>OVETTA MOORE;<br>DARNISHA McGEE;<br>SANDY McCARTHY;<br>ETTY SHALEV;<br>ALEXANDER KAYODE;<br>MARGARET MEDRANO<br><br>        Defendants. | Case No.<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES; VERIFICATION OF JAMILA MROUEH**<br><br>**DEMAND FOR JURY TRIAL** |

1

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES

Plaintiff JAMILA MROUEH, individually and on behalf of her minor children A.M. and N.M., ("Plaintiff"), by and through her undersigned attorneys, alleges as follows:

## INTRODUCTION

1. This is an action for declaratory and injunctive relief and for damages arising from Defendants' deliberate, knowing, and malicious conspiracy to kidnap Plaintiff's children A.M. and N.M., under color of law but in violation of their rights under the Fourth and Fourteenth Amendments to the US Constitution, from their home in Pomona, California, and thereafter subjecting them to abuse and neglect by their DCFS-selected foster parents, deprivation of their religious rights, their rights to communication with their mother, and denial of educational opportunities mandated by California law for children in DCFS custody.

2. This was effected by lying outright to the dependency court, by deceiving the dependency court through deliberate omission of exculpatory evidence, by failing to comply with the court's order to appoint a Court Appointed Special Advocate ("CASA") for seven months now, and even ignoring the orders of the court to keep the parent apprised of all de1. This is an action for declaratory and injunctive relief and for damages arising from Defendants' deliberate, knowing, and malicious conspiracy to kidnap Plaintiff's children A.M. and N.M., under color of law but in violation of their rights under the Fourth and Fourteenth Amendments to the US Constitution, from their home in Pomona, California, and thereafter subjecting them to abuse and neglect by their DCFS-

selected foster parents, deprivation of their religious rights, their rights to communication with their mother, and denial of educational opportunities mandated by California law for children in DCFS custody.

3.  Indeed, while in the hands of DCFS since December 7. 2021, A.M. was prevented from receiving any educational services at all until April 8, 2022 – four months, while both students have been starved and physically and emotionally abused with the connivance of DCFS and its officials. And the court-appointed attorney from Children's Law Center not only has done nothing to correct any of this, but has actively conspired with DCFS to enable these violations of the children's rights.

4.  Having learned that the basis for the original seizure was false, DCFS continues to hold the children and subject them to starvation, intimidation, denial of their religious rights in violation of the First Amendment, and denial of opportunity to protest their mistreatment.

**JURISDICTION**

5.  Original jurisdiction to hear this matter is conferred by 28 U.S.C. Sections 1343(a) and 1331through the many and serious civil rights violations that Plaintiff alleges, including especially the Fourth and Fourteenth Amendments to the United States Constitution and of 42 U.S.C. Section 1983.  Because DCFS is a federally contracted agency under Code of Federal Regulations Title 2, Part 200, it is subject to 42 U.S.C. Section 13031, the federal child abuse reporting mandate.

6.  Any and all state law claims contained herein, including for violations of the California Constitution and the Unruh Civil Rights Act,, are part of the same case or controversy giving rise to the federal law claims, and therefore fall within the Court's supplemental jurisdiction under 28 U.S.C. Section 1367(a).

**VENUE**

7.  Venue is proper in the Central District of California under 28 U.S.C. Section 1391(b) because Plaintiff and Defendant are in this district, and actions and omissions giving rise to the claims have occurred and are ongoing in this district.

**THE PARTIES**

8.  Plaintiff JAMILA MROUEH ("JAMILA") is the mother of her 7-year-old twins A.M. and N.M., who were seized by DCFS on December 7, 2021.  She is now and has been throughout the events in this matter a citizen and resident of Pomona, in Los Angeles County, California.

9.  Defendant DCFS is a county social services agency in the Central District of California, an agency of the County of Los Angeles represented by its county counsel.  The County of Los Angeles and DCFS are not arms of the state and do not have Eleventh Amendment immunity.  *Ray v County of Los Angeles*, 935 F. 3d 703 (9th Cir 2019).

10.  Defendant SANDY McCARTHY ("McCARTHY")  is a nurse that was provided by Assisted Healthcare Services, headquartered at 731 Wilshire Blvd, Los Angeles, and who began providing care to A.M. on October 20, 2021, leaving the assignment on November 9, 2021.  She is being sued in her individual capacity.

11.   Defendant MICHELLE PRAH ("PRAH") is a DCFS social worker that was assigned to A.M.'s and N.M.'s dependency case.  She is being sued in both her individual and official capacities.

12.  Defendant GUADALUPE EAKMAN ("EAKMAN") is a DCFS social worker that was assigned to A.M.'s and N.M.'s dependency case from December 20, 2021 to May 31, 2022.  She is being sued in both her individual and official capacities.

13.  Defendant OVETTA MOORE ("MOORE") was the DCFS foster parent to which A.M. was sent in January 2022 after the DCFS foster parent in Bellflower decided that she did not want A.M. in her home.  MOORE lives in Long Beach.   She is being sued in her individual capacity.

14.  Defendant DARNISHA McGEE ("McGEE") is the foster parent appointed by DCFS through a foster agency after MOORE decided that she no longer wanted A.M. in her home.  In July 2022, N.M. was transferred to her home from that of Angela Webb in Los Angeles.  She is being sued in her individual capacity.

15.  Defendant Attorney ETTY SHALEV ("SHALEV") of Children's Law Center of California is the attorney appointed by the dependency court to represent the interests A.M. and N.M., therefore having the duty as their attorney to seek their welfare and represent their interests.  She is being sued in both her individual and official capacities.

16. Defendant Human Services Aide ("HSA") JESSE JUAREZ ("JUAREZ") works for DCFS at the direction of PRAH, and monitors visits, among other duties.  He is being sued in both his individual and official capacities.

17.  Defendant ALEXANDER KAYODE ("KAYODE") is a DCFS social worker who works with PRAH.  He is being sued in both his individual and official capacities.

18.  Defendant MARGARET MEDRANO ("MEDRANO") is a public health nurse with the LA County court pediatrics program.  She is being sued in both her individual and official capacities.

19. DCFS has acted with the individual defendants named herein (hereinafter "Cooperating Defendants") to deny Plaintiff and her children their constitutional and statutory rights, thereby inflicting grave injury upon them, and continuing this conduct to this day.

## RELEVANT FACTUAL BACKGROUND

### Rogue Zealot Nurse Proselytizing

20. MEDRANO, apparently acting on the authority of DCFS and the dependency court, imposed the requirement that A.M. have an in-home LVN, and placed McCARTHY in the home October 20, 2021.  When she got the report of McCARTHY's violent shaking of A.M. on October 23, 2021, she failed to make her mandated report of suspected child abuse and insisted on keeping McCARTHY in the home.  After the children were seized, Nurse practitioner Wendy L., who works for Loma Linda, told JAMILA that she got a call from MEDRANO falsely representing herself as the children's nurse and canceling all their appointments at Loma Linda.

21. Defendant McCARTHY is a home health care nurse, and a Pentecostal Christian who demanded to be able to pray over A.M. in the name of Jesus, claiming to be able to heal.  She was highly displeased when JAMILA, a Muslim woman, declined her offer.  When McCARTHY grabbed A.M. by the arms and violently shook him on October 23, 2021, JAMILA reported this abuse the following Monday, October 25.  After this report, McCARTHY left on November 9, stating to JAMILA that she would lose her kids. Thereafter McCARTHY reported falsely that JAMILA was over-medicating A.M. and made other negative reports.  She clearly intended to retaliate against JAMILA

for rejecting McCARTHY's Pentecostal religion and for having complained of McCARTHY's physical abuse of A.M.

22.  The DCFS paperwork of December 6, 2021 seeking authorization for the seizure of the children relied significantly on the ongoing investigation by "ER CSW Alexander Kayode."  DCFS did not disclose to the court that this "investigation" relied significantly on the statements of McCARTHY and consistently on hearsay, and nothing more, while omitting the contrary evidence of several others.  KAYODE and PRAH concealed from the court the religious bigotry, antagonism, and reported abuse of A.M. by McCARTHY, whose accusations they relied on heavily.

23.  Defendant PRAH, on December 6, 2021, submitted "Last Minute Information For The Court" ("LMI") calling for the seizure of A.M. and N.M. and referring to an earlier request for an order to remove them from the home that was obtained under false pretenses by KAYODE.  The basis alleged was that Mother "*may be*" over-medicating A.M. – but not N.M.  Defendant PRAH withheld from the court the information that this allegation rested on the evidently retaliatory assertions of Defendant McCARTHY, thus deceiving the court, while omitting the statement of Pomona Unified School District special education teacher Mary Morales ("Morales"), which provided considerable and very credible evidence exculpating the mother and describing McCARTHY's misconduct, which included among other things, making JAMILA uncomfortable with her aggressive Pentecostal proselytizing.

24.  Morales wrote as follows regarding the misconduct of McCARTHY: "The first week was very difficult for [A.M.]. As he got to know me he began to trust me and work with me. At this time the family had a nurse/caregiver named Janette. Janette worked well with [A.M.] and with parent. She helped me work with [A.M.] as well. Her departure was difficult for the family. Mom

has two students with moderate disabilities who are twins. The needs of the children would be challenging for any parent. I felt Jamila handled her children with care, concern, and patience. I never witnessed abuse or signs of physical abuse. I also saw two kids who loved their mom and a mother who tried very hard. She fought for her children and services. I met the nurse who took over for Janette and she was a Christian who spoke freely about her beliefs which I am sure was rather uncomfortable for the family seeing as how they are Muslim. The mother reported the nurse for shaking [A.M.] and then all her troubles started."

DCFS withheld this from the dependency court.

25.  DCFS, on these false pretenses, obtained an order on December 6, 2021 and seized the children on December 7, 2021, It had withheld from the dependency court the information that DCFS was relying on the allegations of a known religious bigot who was evidently retaliating against JAMILA's rejection of her Pentecostal religion, and for JAMILA's complaint against her of violent physical abuse committed on October 23, 2021 – all of which DCFS was fully aware of.  DCFS concealed this exculpatory evidence of Morales, and so did SHALEV, who additionally bullied Morales when Morales held to the truth during their interview.

26.  Concerning the misconduct of SHALEV, Morales's letter reported"

"I was contacted by the Children's Lawyer, Etty Shalev. She asked me questions about Jamila and [A.M.]. When I answered she indicated that I was wrong or misinformed. I found this highly unethical. She indicated that I didn't know the true history of Jamila and that she and I quote, "conniving and manipulating dangerous person if I wanted to hear her history then I would change my mind" I told her that was very prejuicical [sic] and that my opinion was formed on what I saw and not on what others tell me. She then said I saw

[A.M.] too late and that mom made me go so late. That was not true. I go at 5pm because home hospital teachers teach during the day. I teach from 8-3:15. I then have another student from 3:45-4:45 and then I see [A.M.] at 5. She said that that is not what my boss Abril Diaz told her. That Abril told her I was told by mom. I indicated that I had an email from my administrator that indicated otherwise and that either I am a liar, or my boss is a liar. Ms. Shalev told me I was being combative. I did not see my behavior as such, but I told her I didn't see what she was telling me as true. She indicated that [A.M.] should be potty trained and have a normal sleep schedule. But, anyone who works with or is a parent of a child with Autism will tell you not all children are every potty trained and some never talk. This disability is on a spectrum. Also children with Autism do have trouble with sleeping. She also tried to tell me about his IEP. I indicated to her that he has been placed in the wrong setting for years now and that his current setting of PBIS. We are in the process of getting the documentation of his Autism diagnosis and looking at his placement again. The lawyer then tried to say that mom manipulated that too. . ."

SHALEV rejected the personal knowledge of A.M.'s teacher in favor of hearsay passed on by others from a known religious bigot who had been reported for violently shaking A.M.

27. In addition, DCFS conceded in its removal petition before the seizure that the charge of over-medicating was by no means proven. Once DCFS learned and acknowledged that it was *not* true, DCFS still refused to return the children to their mother's care, in spite of the family's presumptive right to familial association most recently emphasized by the Ninth Circuit on June 27, 2022 in *Hannah David v Gina Kaulukukui* (Case 21-15731, D.C. No.1:20-cv-00002-JMS-WRP).

28. Defendant KAYODE signed and submitted to the dependency court on December 6, 2021 the DCFS removal petition that sought the removal of A.M. and N.M. from their family home on false pretenses.  KAYODE gave false evidence and hid exculpatory evidence in order to bring about the seizure of the children.  Specifically, KAYODE failed to mention A.M.'s special education teacher, Morales, or the letter that she wrote on Pomona Unified School District letterhead, nor did he provide it to the court.  KAYODE also verbally abused A.M. while seizing him on December 7, 2021, thereby needlessly enhancing A.M.'s panic, and the terror and emotional distress being inflicted upon him and his sister.

**Starvation of Children**

29.  PRAH has ever since connived at the neglect and abuse of the children by foster parent McGEE.   PRAH explained the children getting thinner these past several months by saying that they are "stretching out," while they continue to lose weight.  Just recently, on or about August 15, 2022, N.M.'s front tooth – not a baby tooth – was knocked out without explanation.[1]

30.  Defendant EAKMAN enabled and covered up the starvation of A.M. by MOORE while he was at her home, noted by A.M.'s teacher at Chavez Elementary School in Long Beach Unified School District ("LBUSD"), who stated that A.M. was hungry all day long at school.  EAKMAN explained this by asserting that A.M. was saying he was hungry just because he didn't want to do his schoolwork.  EAKMAN, being a social worker, knows or should know that children don't want to do their schoolwork when they're hungry all the time.  And if a child asking for food all the time is ascribed to not wanting to

---

[1]At this writing, about three weeks later, N.M. has still not been taken to the dentist.

do schoolwork, this pretext will ensure that nothing is done when a child is being starved.  In fact, once JAMILA started sending food to school, A.M. stopped asking for food all the time.

### Violation of Children's' Religious Dietary Laws and Other Observances

31. EAKMAN watched with approval as MOORE fed A.M. pork in JAMILA's presence, and took no action at any time to stop her from doing so.  She punished JAMILA for wanting A.M. fed according to Islamic standards by letting MOORE leave meat to rot for hours in the sun, which JAMILA had brought.  EAKMAN, like PRAH, also mocked JAMILA's beliefs regarding dietary rules.

32.  PRAH arbitrarily pulled N.M. out of her foster home with Angela Webb, where she was clean, adequately fed, and attending school, and placed her with her brother in McGEE's home in Long Beach. PRAH has conspired with McGEE to deny both A.M. and N.M. their scheduled visits with JAMILA. PRAH knows that McGEE has been starving A.M. and N.M. – to which N.M. will testify – defending McGEE's conduct with the absurd excuse for their getting thinner that they are "stretching out" as they lose weight.  McGEE has not kept N.M. in clean and adequate clothing.  PRAH knows and condones McGEE denying N.M. the opportunity to go outside and play, because in McGEE's judgment N.M. has not earned enough behavior points, so that McGEE makes her sit in a room all day watching television.

33.  The dependency court issued an order on May 19, 2022 that "the Department is to make best efforts to place the child with a Muslim family."  Such a family, friends of the mother, soon became available.  DCFS then made rigorous demands on that family, including wanting to thoroughly vet their grown children.  That this concern was pretextual, designed to sabotage the

possible placement, may reasonably be inferred from DCFS and its staff being completely unconcerned about McGEE parking the children in her charge with her aunt so that she could go to work, without McGEE's aunt having been vetted by DCFS in any way.

34.  In like manner, PRAH on or about July 31, 2022 refused to allow N.M. and A.M. to attend the Muharram program at the mosque in Pomona or in Anaheim, on the pretext that she needed two weeks notice in order to vet the person who was to pick them up and bring them back home, also refusing to take the children herself.  The Shi'a commemoration during the month of Muharram of the death of Hussein at Karbala is one of the most solemn times in the Shi'a Muslim calendar.  PRAH very intentionally prevented the children from participating in this observance in any way.

35.  PRAH has worked with MOORE and McGEE to deprive the children of their right to practice their religion – moreover allowing these foster parents to indoctrinate them in Christian cultural practices and feeding them pork in the same manner that Indian boarding schools destroyed the American Indian culture of their inmates.


**Children's Counsel Conspiring with Others to Deprive Children of Their Rights**

36.  When Plaintiff filed a due process complaint with the Office of Administrative Hearings ("OAH") against two school districts and DCFS on January 31, 2022 to redress and vindicate A.M.'s educational rights, and to seek assessments and compensatory services, Defendant SHALEV of Children's Law Center moved in the dependency court on February 2, 2022 to remove Plaintiff's educational rights, in order to enable DCFS and the districts to continue denying the children the educational services to which they are entitled.

37.  SHALEV, who as an attorney is obliged to defend the rights of her clients, has instead consistently represented DCFS against the children, even making false accusations in court against JAMILA and her educational advocate, Peter Attwood, so as to deceive the court into enabling DCFS to continue abusing the children and violating their rights. She herself has taken no action at any time to vindicate those rights to this day, as enumerated for instance, in Welfare and Institutions Code ("WIC") Section 16001.9(a) and in California Rules of Court 5.651 – although she knows, because they are her clients, that it is her duty as their attorney to assure these children of these rights and to see to it that the neglect and abuse being inflicted upon them is stopped.  For instance, SHALEV was made aware that A.M. was being fed pork in violation of his religion, and that MOORE had fraudulently used or permitted to be used JAMILA's Amazon account to buy Christian literature in order to indoctrinate A.M.  She knew and condoned both children being prevented from participating in religious activities, in violation of the First Amendment and WIC §16001.9(a)(15).  SHALEV has refused to take any action to vindicate the children's rights in these matters, instead conniving at their denial for the convenience of DCFS – although she knows that it is her duty as their attorney to enforce the rights of her clients, not to conspire with other parties in the case to deny them.  SHALEV has refused to pursue recovery of the money stolen from JAMILA in order to provide religious indoctrination against her will by or with the approval of MOORE, PRAH, and others at DCFS who know about this theft and religious indoctrination and have done nothing about it.

38. JAMILA was present at the May 23, 2022 dependency hearing and heard SHALEV state a variety of lies to the court.  Attwood then made a declaration regarding what was said, and the truth, with considerable documentary support in exhibits.  Among these:

- SHALEV falsely stated that Attwood had claimed to be a CASA.

- SHALEV falsely told the court that the schools were complaining that Attwood was calling all the time and harassing them in some way.  No evidence was provided to support this baseless and conclusory accusation. JAMILA has been present at several other hearings in which SHALEV made baseless accusations against JAMILA in court, most recently on August 31, 2022.  When asked by her counsel Andrew Haas to support them, she has not done so.  Indeed, the dependency court record will support this allegation.

39 Despite the dependency court order on February 2, 2022 that provided that mother be "apprised of all developments" in A.M.'s education, SHALEV took no action to get the order enforced, and instead conspired with DCFS to continue through April 7, 2022 to keep A.M.'s mother completely in the dark in violation of the court order.  Instead SHALEV lied in court to the effect that Plaintiff's special education advocate was claiming to be a CASA, along with various other factual misstatements for which she did not and could not provide any factual support.

40.  The dependency court in its order of February 2, 2022 ordered SHALEV to arrange the appointment of a CASA to seek the children's welfare.  Despite this order over seven months have passed, and SHALEV has taken no action to comply with the dependency court's order.

**DCFS Intentional Facilitation of Abuse**

41.  PRAH has also condoned McGEE denying N.M. the right to communicate freely with her mother, cutting off her calls and forbidding her to tell her mother what she has been fed, or to describe other abuses to which she is being subjected.  PRAH has failed to notify the dependency court of these violations

of N.M.'s rights – and outright abuse – by which N.M. is being further traumatized daily.

42. Pediatrician Kelly Callahan reported on February 28, 2022 that A.M.'s height was in the 43rd percentile and that his weight was 52 pounds in the 51st percentile.   She also reported "no seizure activity reported."  This report was delivered to the court in the March 24 "Last Minute Information to the Court" ("LMI").   The previous month, on January 21, 2022,  Callahan  stated that MOORE had reported two seizures in the month or so that he had been in MOORE's home.  This report – supporting JAMILA's statements that A.M. did have a seizure disorder – was concealed from the court.  EAKMAN arranged these forensic physician's visits.  MEDRANO wrote, and on information and belief, filed the LMI with the court dated March 24. 2022 which buried the relevant exculpatory information that A.M. had indeed experienced two recent seizures – corroborating JAMILA's account.

43. More than once, Defendant HSA JESSE JUAREZ has stated that because N.M. is only seven years old, her statements about her treatment – in particular, how she is being fed – deserve to be disregarded.  JUAREZ's intention is evidently to cover up the abuse and neglect that the children are being subjected to, doing what he can to ensure that N.M. is not heard and believed. It is our belief that he is taking this position against the children in order to facilitate the DCFS cover-up of the neglect and abuse that they are now being subjected to with McGEE, including being starved by McGEE, since it is N.M.'s description of what they are being fed that he has dismissed in this way.

44. That JUAREZ is belittling the evident starvation of the children because he is being directed to do so by his supervisor, PRAH, appears evident from the same behavior of his superior, who in like manner told Plaintiff that the kids look thin because they "are stretching out," and that they constantly ask for

food because JAMILA "always has food."  Without investigation, PRAH has determined that their asking for food at every opportunity is not because they are always hungry.  That they are seven years old and have actually been losing weight documents the likelihood that the children are being starved, but PRAH, JUAREZ, and apparently their supervisors have taken no action to investigate and stop this abuse, in fact turning a blind eye to it.

45. McGEE has been pulling N.M.'s hair out to this day, causing sores and bare spots.  PRAH and JUAREZ have seen the evidence of this abuse on N.M.'s head, and to this day are taking no action to stop it, instead trying to intimidate JAMILA when she protests this abuse – and failing to make their mandated reports of "reasonable suspicion" of abuse.

46. McGEE, with the connivance of PRAH, is forbidding the regional center to come to her home to evaluate the children, just as she refused to let A.M. go to summer school.  Long Beach Unified School District reports approximately 49 unexcused absences during the spring 2022 semester – in addition to McGEE's refusal to enroll in or take A.M. to the Extended School Year ("ESY") mandated by his IEP.  When someone has custody of children and ensures no contact with others, then that alone indicates that abuse is taking place.

47. McGEE asked on August 25, 2022 for permission to take A.M. and N.M. on a family vacation to Palm Desert on September 3-6, 2022, and JAMILA refused. This violates the truancy law at Ed Code 48200 et seg., which does not allow for family vacations as a reason to be absent from school, and Long Beach Unified School District is firmly against it.  That N.M.'s tooth was broken around August 13, 2022 by a hard blow to the side of her face is still unexplained.  Not yet taking N.M. to the dentist to this day,  now three weeks later, is clearly medical neglect, and quite possibly due to the dentist being a

mandated reporter who likely would report what he finds.  N.M. needs to be taken to the dentist before she loses the tooth completely, not to Palm Springs.

48. PRAH has not addressed the medical neglect and the reasonable suspicion of violent physical abuse that caused N.M.'s tooth to be broken and the side of her face to hurt.  Instead, PRAH submitted an ex-parte request to the dependency court on August 25, 2022 to allow McGEE to take N.M. and A.M. out of school and to the "Shadow Mountain Resort and Club" in Palm Desert, wholly unsupervised in another county, and where A.M. is quite likely to bolt and could easily end up drowned in a swimming pool.  When JAMILA called Shadow Mountain, she was told that access to the pool is not limited at all, and that any eight-year-old can open the gate.  On false pretenses, PRAH received court permission to authorize this truancy, to overlook the certainty of gross medical neglect, and the "reasonable suspicion" that N.M.'s tooth was broken by McGEE or someone else in her household.   PRAH has concealed from the court the insecure and therefore very dangerous free access to the pool, when she knows that A.M. frequently elopes, and quickly.

49. Plaintiff has been informed, and believes, that a mandated report of starvation of the children was made to DCFS on August 12, 2022, over three weeks ago. DCFS has done nothing about it, except to facilitate an unsupervised trip to Palm Desert September 3-6,2022.  Another mandated reporter told Plaintiff that she made a like report to DCFS a little earlier, and in violation of California Penal Code Section 11165.9, DCFS refused to accept the report.

**Sexual Abuse Ignored**

50. At her August 27, 2022 visit, which she recorded in full, JAMILA noticed N.M. rubbing her vagina, and then N.M. rubbed her butt against Jamila in a sexual way.  JUAREZ was watching all this, and when JAMILA drew his

attention to it, he was dismissive as on other occasions.  Moreover, N.M. was watching a sexually oriented show for teenagers , and talking about the "true love's kiss" of Snow White.  None of this has happened before.  This girl is only seven years old.  During this meeting JUAREZ tried to prevent this from being addressed, as the recording will show.

## FIRST CAUSE OF ACTION

### (AGAINST ALL DEFENDANTS)

For violation of the mother's and children's rights under the Fourth and Fourteenth Amendments to the US Constitution, the Civil Rights Act of 1964, and California Welfare and Institutions Code Section 16001.9.

51.  Plaintiff hereby incorporates all the allegations contained in paragraphs 1-50 above.

52.  As the Ninth Circuit indicated in *Hannah David v Gina Kaulukukui* (For Publication)*,* familial association "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court."  DCFS and its agents violated this liberty interest by resorting to judicial deception to bring about the unreasonable seizure of the children on false pretenses.  The court explained that the right of familial association is grounded in the Fourth and Fourteenth Amendments.[2]

---

[2] "Our caselaw has long recognized this right for parents and children under the Fourth and Fourteenth Amendments. See, e.g., Keates, 883 F.3d at 1235–38 (explaining the origins of the right); Wallis v. Spencer, 202 F.3d 1126, 1136–37 (9th Cir. 2000). For parents, the right to familial association is generally grounded in the Fourteenth Amendment's Due Process Clause, while claims brought by children are evaluated under the more "specific" Fourth Amendment right to be free from unreasonable seizures. See Kirkpatrick v. County of Washoe, 843 F.3d 784, 788–89 & n.2 (9th Cir. 2016) (en banc). However, "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children." Keates, 883 F.3d at 1236 (quoting Wallis, 202 F.3d at 1137 n.8)."

53. When the putative justification for the seizure was acknowledged to be false, DCFS, abetted by the children's attorney, refused to return them to their home. Instead DCFS has subjected the children to ongoing neglect, abuse, and denial of their religious and educational rights, and their mother to great anguish and emotional distress, along with great financial expense.

## SECOND CAUSE OF ACTION

### (AGAINST ALL DEFENDANTS)

For discrimination and retaliation against the mother and her children in violation of the First Amendment right to the free exercise of their religion, and of the Civil Rights Act of 1964.

54.  Plaintiff hereby incorporates all the allegations contained in paragraphs 1-50 above.

55.  The First Amendment, through the Equal Protection Clause of the Fourteenth Amendment, forbids governments to abridge the free exercise of religion. California enacts this protection for foster children at WIC § 16001.9(a)(15). DCFS, its agents, and two of its foster parents, have orchestrated the systematic denial of the children's right to the free exercise of their religion.  PRAH even took care to ensure that the children could not participate in the observances of the month of Muharram.

56.  DCFS has also violated the Establishment Clause by enabling foster parent MOORE to teach Christian curriculum to A.M., having also condoned the purchase of such curriculum through theft from the mother's Amazon account. Earlier, DCFS facilitated the retaliation of  McCARTHY against JAMILA for rejecting her Pentecostal Christian religion – hiding from the dependency court the evidence from special education teacher Morales that this happened.

**THIRD CAUSE OF ACTION**

(AGAINST ALL DEFENDANTS)

For religious discrimination and retaliation against the mother and her children in

violation of the Civil Rights Act of 1964, Title IV-E of the Social Security Act

57.  Plaintiff hereby incorporates all the allegations contained in paragraphs 1-50 above

58.  The Civil Rights Act of 1964 and Title IV-E of the Social Security Act forbid the religious discrimination and retaliation carried out by DCFS and its agents as described in this complaint.

**FOURTH CAUSE OF ACTION**

(AGAINST ALL DEFENDANTS)

For engaging in racketeering activity in violation of 18 U.S.C. Section 1961 et seq.

in order to injure plaintiff, first by seizing and kidnapping A.M. and N.M. under

color of law, and thereupon abusing and neglecting the children, and denying the

family their right to familial association.

59.  Plaintiff hereby incorporates all the allegations contained in paragraphs 1-50 above

60.  DCFS and the Cooperating Defendants engaged as described in this complaint in a pattern of racketeering activity that was intended and carried out to cause injuries to Plaintiff, A.M., and N.M. by impermissibly seizing and kidnapping A.M. and N.M.., making untruthful reports or statements about Plaintiff and her supports, initiating and furthering these injuries through judicial deception,

neglecting and abusing the children in their custody to this day, and engaging in a systematic effort to obliterate their religious and cultural identity. thereby violating 18 U.S.C. Section 1962(c), among others.

61.  Defendants KAYODE, PRAH, EAKMAN, and SHALEV conspired together to make these false statements in court documents.  They conspired together to keep true exculpatory facts out of the petition to remove the children, with SHALEV even bullying Morales to induce her to renounce her factual statements.  Defendants have continued to agree on falsehoods and even to assert them in court, with SHALEV knowingly making false accusations against JAMILA and her educational advocate in court in order to further the conspiracy to maintain the kidnapping.

62.  All these defendants and the Cooperating Defendants knew the general status of the conspiracy to continue to unconstitutionally hold the children, as they actively participated in it.   All Defendants knew, as they conspired to doctor documents and deceive the dependency court, that the conspiracy extended beyond their individual roles.  All Defendants have been aware of the continual assault on the religious identity of the children, accomplished by permitting the foster parents to feed them pork, by supporting the foster parents in denying the children any opportunity to participate in observances of their religion, and indeed by making sure that they have been placed in foster parent homes in which this religious discrimination would be facilitated.

63.  Each of these Defendants knew as they consulted together to falsify documents and to keep the children kidnapped – even denying their rights under the Constitution and WIC 16001.9 – that the conspiracy extended beyond their individual acts.

64.  Plaintiff is informed and believes that the Defendants, each individually and in concert, acted herein knowingly, deliberately, intentionally, and maliciously.

65.  Plaintiff has no clear, immediate, and practicable remedies other than to seek relief in this Court.

## FIFTH CAUSE OF ACTION
### (AGAINST ALL INDIVIDUAL DEFENDANTS)
### **For violations of the Unruh Civil Rights Act**

66.  Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in paragraphs 1-50 of this complaint. While DCFS is not a business establishment, and therefore is not liable for violations of the Unruh Civil Rights Act (California Civil Code § 51-53.) ("Unruh Act"), all individual  persons ("whoever") is liable for their violations of the Unruh Act.  Cal. Civ. Code §52(a).

67. The Unruh Act provides that a violation of the ADA is a violation of the Unruh Act.   Cal. Civ. Code, § 51(f).

68. Defendants, through each of their acts and omissions, as herein alleged, have violated the Unruh Act by, inter alia, denying, or aiding, or inciting the denial of, Plaintiff's rights to full and equal use of the accommodations, advantages, facilities, privileges, or services offered.

## SIXTH CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)

Violations of 42 U.S.C. §§ 1983 and 1985; Fourth and Fourteenth Amendments

69. Plaintiff repeats and realleges each and every allegation in paragraphs 1-50 of this Complaint with the same force and effect as if fully set forth herein.

70. Defendants, individually and in concert, conspired and acted to date to deprive Plaintiff of her constitutional rights, and those of her children.  Under the color of State law, DCFS, as a local social services agency, has acted to this day through the individual defendants to kidnap and to continue to hold JAMILA's children and to subject them to physical, emotional, and in N.M.'s case, likely sexual abuse.  DCFS has also, to this day, supported and is continuing to support the individual defendants in their own violations of JAMILA's and her children's constitutional rights, traumatizing both JAMILA and her children. These defendants conspired to violate Plaintiffs' First, Fourth and Fourteenth Amendment rights in order to intimidate, harass and threaten JAMILA, even for making lawful complaints of their abuse.

71. Plaintiffs' claims against DCFS and Cooperating Defendants are based on their maintaining and permitting practices, policies and customs described above that would facilitate the abuse and traumatization of Plaintiff and her small children in violation of their rights to familial association, the Fourth and Fourteenth Amendments, religious and liberty, and the rights under federal and state law of children to be free from emotional, physical, and sexual abuse while in the custody of DCFS.

72. As a result of their conduct, these defendants are liable for Plaintiff's injuries, because they (i) conspired, (ii) were integral participants in the misconduct, or (iii) because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

73. Plaintiffs allege that the acts and omissions of these defendants were willful, malicious, intentional, oppressive, reckless, and/or were, and continuing to be, done in willful and conscious disregard of Plaintiff's and her children's rights, welfare and safety, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

74. As a direct and legal result of these defendants' acts and omissions, Plaintiff suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

SEVENTH CAUSE OF ACTION

(AGAINST ALL DEFENDANTS)

For Injunctive Relief

75. Plaintiff repeats and realleges each and every allegation in paragraphs 1-50 of this Complaint with the same force and effect as if fully set forth herein.

76. Plaintiffs' claims against DCFS and Cooperating Defendants are based on their maintaining and permitting practices, policies and customs described above that would facilitate the abuse and traumatization of Plaintiff and her small children in violation of their rights to familial association, the Fourth and Fourteenth Amendments, religious and liberty, and the rights under federal and state law of children to be free from emotional, physical, and sexual abuse while in the custody of DCFS.

77. A simple award of damages is insufficient to compensate Plaintiff for the significant and severe constitutional deprivations and the threat of such future violations by these defendants against Plaintiff.

78. No plain, adequate, or complete remedy at law is available to Plaintiffs to redress the wrongs addressed above. These defendants must be enjoined from engaging in activities described above and any activity that would interfere with or violate Plaintiffs' constitutional rights.

79. If this Court does not grant injunctive relief for Plaintiff and against these Defendants, Plaintiffs will be irreparably harmed.

**PRAYER FOR RELIEF**

Plaintiff requests relief as follows:

1. The entry of a judgment declaring that the seizure of A.M. and N.M. through judicial deception, and without even alleging the imminent danger to the children required to overcome their right to familial association, was unlawful – and still more, that continuing to hold them when DCFS has conceded that the original justification for the seizure did not and does not exist merits a finding that Plaintiff is the sole person entitled to custody and possession of her children.

2. The entry of a temporary, preliminary, and permanent injunction restraining the Defendants, their agents, employees, and successors in interest from continuing to seize and restrain A.M. and N.M.. and from failing to return them forthwith to Plaintiff.  The Court should notice that no allegation of actual harm to the children in mother's custody was ever made, and the threat of potential harm is speculative, whereas the actual neglect and abuse to the children in many ways since December 7, 2021 is undeniable and ongoing.

3. General and special damages in amounts to be proven at trial.

4. Punitive and/or exemplary damages from the individually named Defendants.

5. Reimbursement of Plaintiff's costs and expenses herein, including reasonable provision for her attorneys' fees, and additionally, reimbursement of her legal expenses in the dependency case and education-related litigation.

6. For injunctive relief, compelling Defendants to comply with the Fourth and Fourteenth Amendments and other federal and state law protecting the children, including the return forthwith of the children to their mother.

7. Damages under the Unruh Civil Rights Act, which provides for actual damages and a statutory minimum of $4,000 per offense.

8. Reasonable attorney fees, litigation expenses and costs of suit, pursuant to 42 U.S.C. § 1988, as explained by the U.S. Supreme Court in *Chrisiansburg Garment v. EEOC,* 434 U.S. 412 (1978); and Cal. Civ. Code § 52.

9. For such further and additional relief as the Court deems appropriate and just.

Dated:  September 3, 2022

Michael T. Stoller
Attorney for Plaintiff